Filed 9/13/22 P. v. Gallegos CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093509 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE017974) |
| v. | |
| JOE MADRID GALLEGOS, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

During an encounter with defendant Joe Madrid Gallegos, police officers searched defendant's car and shortly thereafter, his girlfriend's car, which defendant had been driving two months earlier when arrested for drug sales. Prior to the search, the officers confirmed defendant was on informal searchable probation. The officers found baggies containing methamphetamine and two firearms in the girlfriend's Honda.

1

The People filed a complaint charging defendant with four counts, including, in count one, felony possession of methamphetamine while armed with a loaded, operable firearm, in violation of Health and Safety Code section 11370.1, subdivision (a). The complaint also alleged that defendant had a prior serious felony conviction, a strike, within the meaning of Penal Code section 1192.7, subdivision (c) (statutory section citations that follow are to the Penal Code unless otherwise stated) and that he fell within the provisions of section 667, subdivisions (b)-(i), and section 1170.12.

Following the trial court's denial of his motion to suppress evidence, defendant entered a plea of nolo contendere to count one. Defendant also admitted to having a prior strike. The trial court sentenced defendant to two years in prison on count one, and that term was doubled to four years due to his prior strike offense. Defendant was given 844 days of credit for time served.

In his opening brief, defendant argues the trial court improperly denied his motion to suppress. Defendant argues the trial court incorrectly concluded that his encounter with the officers began as a consensual encounter, and he argues that the officers lacked sufficient justification to detain him under the Fourth Amendment of the United States Constitution. In his opening brief, defendant also argues that no intervening circumstances attenuated the "taint" of the initial encounter to render the subsequent searches constitutional.

In his supplemental brief, defendant argues he was denied effective assistance of counsel because his attorney in the trial court did not try to admit additional body camera video footage from his encounter with the officers into evidence, which he argues would have supported his argument that the initial encounter with the officers was not consensual.

We conclude that the initial encounter was a consensual encounter. Additionally, we conclude that even if the initial encounter had not been consensual, the officers would have been justified in detaining defendant. Because we conclude the initial encounter

2

was consensual and that the officers would have been justified in detaining defendant, we need not consider defendant's arguments regarding attenuation. We also find his argument that his counsel was ineffective lacks merit and affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

In considering the merits of the trial court's ruling on defendant's motion to suppress, we limit our review to the evidence before the court when it considered the motion, and a concurrent motion brought by codefendant Alaniz Ortiz. (*People v. McKim* (1989) 214 Cal.App.3d 766, 768, fn. 1.) We will integrate a few additional facts as relevant in our discussion of defendant's argument that his counsel was ineffective.

### *Testimony of Officer Anderson*

The only witness at the hearing on the motions to suppress was Officer Maxwell Anderson. At the time of the hearing, Officer Anderson had been a police officer with the Sacramento Police Department for approximately five years. He worked in the north gang enforcement team. The following is a summary of his testimony.

On July 5, 2019, at approximately 4:00 p.m., Officer Anderson was on duty, driving a black SUV with lights but no police stickers, and he was wearing a full uniform. He was with his partner, Officer Christopher Jensen. The officers were near the intersection of Dixieanne Avenue and Oakmont Street, which is part of their normal patrol area. Officer Anderson described the area as, "high crime," one "where there's been multiple shootings, drug arrests, firearm arrests, [and] stolen vehicle arrests." He believes it to be "one of the most crime-ridden areas of the city."

At the side of the road, there was a display that looked like a candlelight vigil. A vacant building occupies the block. Officer Anderson noticed three to four people standing in the open passenger doorway of a black Honda Accord. The Honda was legally parked. As the SUV approached the intersection, the people standing by the Honda looked in the direction of the SUV, and they immediately began walking—but not

3

running—away from the Honda. Officer Anderson did not see defendant in the Honda, and he did not see defendant open the trunk of the Honda or lean into the Honda. He did not see any of the group throw anything in the Honda or make furtive movements towards the vehicle, but his view was also partially blocked by the door. Aside from the group, there were about six other people in the area, which also seemed unusual to Officer Anderson.

Officer Anderson recognized defendant in the group. He had been in contact with defendant three to four times in the alleyway around the corner in the year leading up to July 5, 2019. Defendant had told Officer Anderson that the vigil was for a brother or someone close to defendant who had passed away and that was why he was always in the area. Officer Anderson had driven by the area multiple times, and, as a result of his experience patrolling the area, he believes defendant sits near the vigil multiple times a week, if not every day. He estimated he had seen defendant there 50 to 100 times. Officer Anderson had not seen a larger group or cars gathered in the area with defendant before; defendant was normally alone at the vigil. Officer Anderson believed this could signal something different was going on.

According to Officer Anderson, at the time of his prior contacts with defendant, defendant had been on postrelease community supervision (PRCS), and possibly "another form of probation."[1]

On cross-examination, Officer Anderson admitted that vigils are typically places where people bring items related to a deceased person's memory, but he also testified that "people can use vigils for all kinds of things, such as cover for drug dealings. So if we want to--argue about it, that's how I felt he was using the vigil . . . ." Officer Anderson

---

[1] During most of his testimony, Officer Anderson used the word "probation" to describe defendant's supervised status during their prior encounters. We will use "probation" here too.

also stated that he believed there had been reports of drugs found underneath the candles in the vigil, though those reports had not identified defendant or codefendant Ortiz.

Officer Anderson testified that given his familiarity with defendant's probation contacts, and the fact that the group was walking away from the car, which felt evasive to Officer Anderson, he got out of his vehicle and tried to contact defendant. Officer Anderson testified that he said, "hey . . . [y]ou in the red shirt, can you come talk to me?" Officer Anderson stated that when he called to defendant, defendant kept walking, and it was possible defendant had not heard him the first time. According to Officer Anderson, he tried to get defendant's attention again. Officer Anderson testified that when defendant asked, "oh, who me?," Officer Anderson said, "[y]eah, you are the one I'm talking to." Officer Anderson testified defendant then walked over to Anderson and they began to chat. According to Officer Anderson, he definitely did not have his sirens on as he approached the curb and he could not recall if he had turned on his lights. Officer Anderson testified that he did not speak to the men over a loudspeaker and say something like, "hey, stop right there."

Officer Anderson stated that when he got out and yelled for the men to come talk to him, he singled out defendant because he was aware that defendant was on probation, because he had interacted with defendant when responding to various shootings and firearms discharge reports in the area. Officer Anderson testified that under "the totality of the circumstances"—which included, "[t]he fact that there [were] additional people gathering in that area," and that the area "is a high crime area," and he believed he had seen reports "listed of that actual intersection, where there's been even drugs located underneath the candles of the vigil"—he believed defendant was probably selling drugs at the sight of the vigil.

On cross-examination, when asked if he knew the specific terms of defendant's probation, Officer Anderson admitted he was not sure of the specific start and stop dates of defendant's probation, but noted that defendant had been on probation during those

5

prior encounters and probation typically lasted three to five years. Officer Anderson also stated that if he wanted to detain defendant due to his probation status, defendant would be required to stop.

Officer Anderson testified that once he and defendant began talking, he explained that the reason he was contacting defendant was defendant's probation status. According to Officer Anderson, defendant responded that he was no longer on probation or parole.

According to Officer Anderson, as he and defendant began to speak, Officer Jensen ran defendant's name through a system that allows police officers to check some of an individual's history, and the search confirmed that defendant was, in fact, on informal searchable probation. Shortly thereafter, Officer Anderson looked at the results of the search and confirmed defendant's status for himself. When Officer Anderson confirmed defendant was on informal searchable probation, he saw the end date was June 2, 2022. After confirming defendant was on probation, Officer Jensen placed defendant in handcuffs.

Officer Anderson testified that he and Officer Jensen then detained the two other subjects who had been standing in the doorway of the Honda. Ortiz, who had been sitting in the passenger seat of the Honda, then got out of the car, and the officers detained her too. The officers detained the other people who had been standing near the Honda and Ortiz by having them sit on the curb in front of the Honda. According to Officer Anderson, it is typical—when a probationer sees officers then reacts evasively—to try to freeze the situation to make sure nothing was dumped or left behind.

Ortiz described defendant as her fiancé. She said the Honda was her car and defendant had his own car.

Officer Anderson spoke with defendant some more, and defendant indicated his car was a silver Chevy Impala parked about 30 yards east of the Honda. The Chevy was legally parked. Defendant did not admit to ever being in possession of the Honda. Officer Jensen notified Officer Andersen he had run a records check on the Honda—

which officers perform by running license plate numbers—and the report showed defendant had previously been arrested for drug sales while in the Honda.

Officer Anderson got the keys to the Chevy from defendant and searched the vehicle. Officer Anderson estimated defendant was in handcuffs for five to 10 minutes before the police officers searched the Chevy. On the front passenger floorboard, Officer Anderson found two boxes of sandwich bags. In the center console, there was a black digital scale, and in the armrest of the console there were two clear baggies. One was tied and the other had what looked like a marijuana leaf inside. These items were significant to Officer Anderson because it is common for drug dealers to use sandwich baggies to package their drugs and the scale to weigh their drugs. Officer Anderson believed the way the bags were tied was unique and the clear plastic bag was indicative of narcotics sales or packaging. In the glove compartment of the Chevy was a purse with documents with Ortiz's name on them.

After searching the Chevy, based on the fact that defendant had been standing close to the Honda, defendant's reaction to seeing the police, the fact that defendant had been arrested in the Honda before, and the fact that defendant's car—which was parked on the same curb line as the Honda—had multiple pieces of evidence that suggested drug sales, the officers tried to get the key to Ortiz's Honda in order to search it. They went back to Ortiz and told her that, based on everything that had happened, they were going to search her car. She was argumentative and uncooperative; Officer Jensen placed her in handcuffs, then found the key to the Honda on her person as he walked her to a patrol vehicle. Officer Jensen took the key from Ortiz.

The officers then searched the Honda. On the front passenger floorboard, Officer Anderson found a female's black wallet that was zipped open and contained two tied-off plastic baggies which, in turn, contained methamphetamine. Officer Jensen searched the driver's side. Officer Jensen told Officer Anderson he found an orange pill bottle with defendant's name on it. The officers found a digital scale underneath the radio.

7

Officer Anderson assisted in searching the trunk of the Honda. There was a grocery bag full of glass pipes that are typically used for smoking methamphetamine. Officer Jensen found two firearms in the trunk. Officer Jensen told Officer Anderson he found male clothing in the trunk.

Officer Anderson advised defendant of his *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) rights at the scene, and defendant waived those rights. Defendant admitted the clothing in the trunk was his.

Based on the fact that defendant had been arrested in the Honda before, the fact that defendant had been close to the Honda, the drugs and firearms in the Honda, the indicia of drug sales in both the Honda and the Chevy, and audio from defendant and Ortiz while in the cruiser, Officer Anderson arrested defendant and Ortiz.

*The Body Cam Footage Entered into Evidence on the Motions to Suppress*

In considering defendant's and Ortiz's motion to suppress evidence found in the searches of their vehicles, the court watched 46 seconds of body cam footage taken from Officer Anderson's body cam when he encountered defendant. The following describes what happened during those 46 seconds.

At the beginning of the video clip, there is no sound and Officer Anderson is driving. Officer Anderson stops at a stop sign and turns left. Then, Officer Anderson pulls over to the left side of the road and stops his vehicle. The audio recording for the camera is activated and you hear the click as Officer Anderson opens the vehicle's door. No sirens can be heard, and it does not look like the vehicle was running any police lights at this time. As Officer Anderson starts to step out of the car, he says, "come here." Based on when you can tell the audio recording was activated, and when you hear Officer Anderson open the car door, it is unlikely Officer Anderson said anything to the group before "come here." Once Officer Anderson is out of the car, you see defendant in red and his companions, one who is wearing a printed black shirt, walking away. Officer

8

Anderson says, "guy in the red," and defendant and the male in the black printed shirt both turn to look at Officer Anderson. When defendant's companion looks at Officer Anderson, Officer Anderson says, "you can come here too." The companion asks, "me?" and Anderson responds, "yeah." Defendant then turns around and starts to walk away again. Officer Anderson then makes a gesture with his left hand—as if beckoning defendant to come towards him—and says, "hey." Defendant—the only person in red—responded, "oh, you're calling me too?" Officer Anderson says, "yeah, guy in the red shirt." Defendant walks up to Officer Anderson and asks, "what's going on?"

*Ruling on the Motions to Suppress*

The court denied both defendant's and Ortiz's motion to suppress evidence obtained during the search of their vehicles.

The court said the following regarding defendant's motion: "The initial contact between officers and Mr. Gallegos was consensual. The officers stopped their vehicle near the Honda. They did not use their sirens. They did not use the loud speaker [*sic*], and there is no evidence that they activated any lights.

"Officer Anderson saw Mr. Gallegos walking away from the Honda. The officer recognized him, having seen him 50 to 100 times in that area within the last year and also having had personal contact with him on three to four occasions in that area. And the officer called out to him saying, hey, can you come talk to me or words to that effect.

"And Mr. Gallegos did so. Mr. Gallegos walked over to him. Officer Anderson asked him some questions, and Mr. Gallegos answered them. He identified himself, and he told the officer he was not on probation or parole. All of that was a consensual contact.

"The officer subsequently ran his name and confirmed he was on searchable probation. It was at that point that he was handcuffed and detained.

"The officers were justified in detaining him at that point because they knew or had an objectively reasonable belief before handcuffing and detaining him that he was on searchable probation.

"The officers did not need reasonable suspicion to detain him in light of their advance[] knowledge of his probation status.

"From there, the subsequent search of the Chevy Impala was justified because it fell under the probation search exception to the warrant requirement. [¶] . . . [¶]

"Mr. Gallegos identified the Chevy Impala as belonging to him. He had the keys for it. The Chevy was in walking distance of the encounter, and the Chevy was identified by Officer Anderson on the body-cam, and as such, clearly was visible to the officer at the time of his initial contact with Mr. Gallegos. The location of the Chevy does not militate against a finding of reasonableness.

"So, in conclusion, the Court finds the People have shown by a preponderance of the evidence that both the detention of Mr. Gallegos and the search of the Chevy Impala were justified, and neither his detention nor this search was arbitrary, capricious or harassing. Therefore, Mr. Gallegos' motion to suppress is denied."

Thus, with respect to the detention of defendant and the search of the Chevy, the court concluded that (1) the initial interaction between defendant and the officers was a consensual encounter, and the officers did not detain defendant until they confirmed he was on searchable probation (Finding 1), and (2) once the officers did confirm defendant was on searchable probation, they were justified in detaining him and searching the Chevy (Finding 2).

The court then turned its attention to Ortiz's motion to suppress, and the questions of whether she had been improperly detained and if the search of the Honda had been permissible, ultimately concluding "there was an objectively reasonable nexus to sufficiently connect Mr. Gallegos to the Honda; and therefore, to apply the probation search exception to the Honda. [¶] Therefore, the search of the Honda was reasonable

10

and lawful as a probation search based on his probation status. [¶] So, in conclusion, the Court finds the People have shown by a preponderance of the evidence that Ms. Ortiz was not unlawfully detained and the search of the Honda was justified" (Finding 3).

In analyzing Ortiz's motion, the court included the following statements:

With respect to the initial interaction with Ortiz and other parties, the court stated: "There was no threatening or intimidating language used by the officers at this point. There were no weapons drawn. [¶] There were just the two officers on the scene, and they were in a public place in broad daylight. If this was a detention, it was at most a minimal investigative detention. And it would have been reasonable under the circumstances to freeze and assess the situation. In part because they knew Mr. Gallegos was a probationer and the officers were outnumbered."

When discussing the officer's justification for searching the Honda, the court noted: "What officers knew at that point in time was that Mr. Gallegos had walked away from the Honda, away from police. As soon as the police vehicle pulled up, and this was something Officer Anderson had never seen or known Mr. Gallegos to do in his prior contacts with him. [¶] So, walking away from the police like this was something unusual for Mr. Gallegos in the officer's experience with him." The court also concluded that Officer Anderson "believed based on his training, experience and familiarity with that particular location that the nearby vigil might be used by some as a cover for drug activity. [¶] Further, because Officer Anderson had been driving through this area multiple times each week, if not everyday, he knew he had seen Mr. Gallegos at or near the vigil on multiple occasions in the last year. And Officer Anderson knew this area to be among the most crime-ridden areas within the City of Sacramento."

11

DISCUSSION

I

*The Preliminary Contact Did Not Violate the Fourth Amendment*

As a preliminary matter, we note what *is not* at issue in this appeal. Defendant *does not* argue that had the officers discovered defendant's searchable probation status through a legal detention they would have still lacked authority to search his car. Quite the contrary, defendant admits that his "suspicionless search condition gave the officers authority to search his property." Similarly, he is "not arguing that the evidence in Ortiz's Honda should be suppressed because he has privacy interests in Ortiz's Honda. . . . [Defendant] is arguing that but for his illegal detention, which produced the information that he was on informal probation, Ortiz's Honda would never have been searched." Thus, in framing this appeal, defendant does not focus arguments on the merits of the trial court's Finding 2 or Finding 3.

Instead, defendant focuses on Finding 1—i.e., on the trial court's determination with respect to the nature of his interaction with the officers from the time they pulled over to the time they confirmed on their systems that he was on informal searchable probation. Defendant argues that when Officer Anderson pulled over his vehicle and engaged defendant in conversation by saying "come here," he initiated a contact with defendant that was a detention and not a consensual encounter. He further argues that a reasonable suspicion did not support this detention and, therefore, the officer's seizure of defendant was illegal. He argues that because this initial detention was illegal, the results of the subsequent searches of the vehicles ought to have been suppressed. In response, the People argue that the initial contact between defendant and the officers was a consensual encounter that did not rise to a detention until after the officers confirmed defendant was on active searchable probation.

12

We conclude the initial contact between defendant and the officers was consensual.  But, even if we were to find that the initial encounter between defendant and the officers was not consensual, we would conclude the officers were justified in detaining defendant in the short time between when the encounter began and when they verified the details of his probation status.

A.    *Fourth Amendment Protections, Standards, and Principles of Review*

"The Fourth Amendment of the federal Constitution requires state and federal courts to exclude evidence obtained from unreasonable government searches and seizures.  (*People v. Williams* (1999) 20 Cal.4th 119, 125.)  Penal Code section 1538.5 allows a defendant to move to suppress evidence obtained in an improper seizure.  (Pen. Code, § 1538.5.)" (*People v. Garry* (2007) 156 Cal.App.4th 1100, 1105-1106.)  " 'Pursuant to article I, section 28, of the California Constitution, a trial court may exclude evidence under Penal Code section 1538.5 only if exclusion is mandated by the federal Constitution.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 365.)

A defendant who brings a motion to suppress has the initial burden of proving a warrantless search or seizure occurred.  (*People v. Flores* (2019) 38 Cal.App.5th 617, 626.)  "There was no warrant in this case, so the burden shifted to the prosecution to show any warrantless searches or seizures were justified under the Fourth Amendment to the United States Constitution. . . . '[T]he controlling burden of proof at suppression hearings . . . [is] proof by a preponderance of the evidence.' (*United States v. Matlock* (1974) 415 U.S. 164, 178, fn. 14.)" (*Ibid.*)

" ' "An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established

13

facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.' [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review." (*People v. Williams* (1988) 45 Cal.3d 1268, 1301.)' (*People v. Alvarez* (1996) 14 Cal.4th 155, 182 (*Alvarez*); see also *People v. Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [the trial court's findings must be upheld if supported by substantial evidence].)" (*People v. Carter* (2005) 36 Cal.4th 1114, 1140.) "The trial court's ruling may be affirmed if it was correct on any theory, even if we conclude the court was incorrect in its reasoning. (*People v. McDonald* (2006) 137 Cal.App.4th 521, 529.)" (*People v. Durant* (2012) 205 Cal.App.4th 57, 62.)

Where, as here, in addition to presenting arguments about the reasonableness of the search or seizure, a defendant disputes a finding that an encounter between a police officer and defendant was consensual, we first determine the form of the encounter and then determine if the requisite level of justification was present to support the encounter. (See *People v. Jones* (1991) 228 Cal.App.3d 519, 523, 524.) This is so because the type and level of justification required for a contact to pass constitutional muster varies depending on the form of contact. (*Id.* at pp. 522-523.) "For purposes of Fourth Amendment analysis, there are basically three levels of police contacts or interactions with individuals. First are 'consensual encounters.' They are police-individual interactions which result in no restraint of an individual's personal liberty whatsoever . . . . (*In re James D.* (1987) 43 Cal.3d 903, 911.)" (*Ibid.*) Consensual encounters do not trigger Fourth Amendment scrutiny (*Florida v. Bostick* (1991) 501 U.S. 429, 434), and "may properly be initiated by police officers even if they lack

14

any 'objective justification.' " (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784.) "Second are 'detentions.' They are seizures of an individual which are strictly limited in duration, scope, and purpose, and which may be undertaken by the police if there is an articulable suspicion that a person has committed or is about to commit a crime. (*Ibid.*) Third are those seizures of an individual which exceed the permissible limits of detention, seizures which include formal arrests and restraints on an individual's liberty comparable to an arrest, and which are constitutionally permissible only if the police have probable cause to arrest the individual for a crime. (*Id.* at pp. 911-912.)" (*Jones*, at p. 523.)

B. *The Initial Contact Was Consensual*

Defendant argues the initial contact between defendant and the officers, before they confirmed that he was on searchable probation, was a detention. The trial court concluded, and the People argue, that the initial interaction was consensual and the officers did not detain defendant until after they confirmed he was on searchable probation. On this point, we agree with the People.

An interaction between a police officer and citizen changes from a consensual encounter to a detention, and "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (*United States v. Mendenhall* (1980) 446 U.S. 544, 554; see also *Wilson v. Superior Court* (1983) 34 Cal.3d 777, 790; *People v. Rivera* (2007) 41 Cal.4th 304, 309 ["There is no Fourth Amendment violation as long as circumstances are such that a reasonable person would feel free to leave or end the encounter"].) "This test assesses the coercive effect of police conduct *as a whole*, rather than emphasizing particular details of that conduct in isolation." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821, italics added.) A seizure occurs when "by means of physical force or show of authority," a law enforcement officer "has

in some way restrained the liberty of a citizen." (*Terry v. Ohio* (1968) 392 U.S. 1, 19, fn. 16. (*Terry*))

A central aspect of how the trial court and the parties characterize the nature of the initial encounter between defendant and Officer Anderson is their conclusions about what words Officer Anderson used to get defendant's attention and engage him in the encounter and the impact of those words on defendant. When it determined that defendant's interaction with the officers began as a consensual encounter, the court found that the encounter started when Officer Anderson "called out to him saying, hey, can you come talk to me or words to that effect. [¶] And Mr. Gallegos did so. Mr. Gallegos walked over to him." In their briefs, both of the parties argue about the correctness of this conclusion, with defendant maintaining that Officer Anderson actually initiated the encounter by assertively saying "come here." In contrast, in their statement of facts, the People quote Officer Anderson as beginning the conversation by asking, "[h]ey, you in the red shirt, can you come talk to me?" Then, in their argument, the People acknowledge the first words you hear on the audio are "come here," but assert it is unknown if anything was said before the words "come here."

The body cam footage entered into evidence during the hearing on the motion to suppress sheds some light on the actual words Officer Anderson used. Though Officer Anderson may have testified that he began his efforts to get defendant's attention by saying, "hey . . . [y]ou in the red shirt, can you come talk to me?," the body cam footage shows otherwise. The first words Officer Anderson uttered in the group's direction were "come here." Based on when you can tell the audio recording was activated, and when you hear Officer Anderson open the car door, the People's argument that Officer Anderson said anything before "come here"—let alone that defendant heard it—is not persuasive. (See *Scott v. Harris* (2007) 550 U.S. 372, 378-381 [declining to view facts in favor of a nonmoving party when the parties asserted differing facts on a motion for summary judgment, because there was a videotape capturing events at issue and "[t]here

16

are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. The videotape quite clearly contradicts the version of the story told by respondent and adopted by the Court of Appeal[]." Also, concluding, "[t]he Court of Appeal[] should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape"].)

However, our inquiry does not end in considering only the words Officer Anderson used to initiate the interaction. Having determined Officer Anderson's first words to defendant were "come here," we still must determine if "in view of *all of the circumstances surrounding the incident*, a reasonable person would have believed that he was not free to leave." (*United States v. Mendenhall, supra*, 446 U.S. at p. 554, italics added.) Put another way, we consider if all of the circumstances support the trial court's conclusion that "come here" as used by Officer Anderson had the same effect as calling out and asking, "hey, can you come talk to me?" The circumstances courts look at to determine the nature of an encounter between a law enforcement officer and a potential defendant include more than just the words used. (*In re Manuel G., supra*, 16 Cal.4th at p. 821.) "Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled." (*Ibid.*)

We find *People v. King* (1977) 72 Cal.App.3d 346 (*King*) informative in assessing the trial court's finding that the encounter here was consensual. In *King*, a defendant entered a plea of guilty to possession of heroin after the trial court denied his section 995 motion to set aside the charging information in his case, the validity of which "depended upon the absence of a Fourth Amendment violation in the police seizure of certain heroin . . . ." (*Id.* at p. 348.)

17

In *King* an officer saw the defendant standing with a group of seven or eight other people, and as the officer drove in the direction of the group, the defendant walked away. (*King, supra*, 72 Cal.App.3d at p. 348.) The officer got out of his vehicle and called out to the defendant saying, " 'Danny, stop, I want to talk to you,' " but the defendant continued to walk while speeding up. (*Ibid.*) The officer saw the defendant make a throwing motion and grabbed the defendant to keep him from discarding any further objects. (*Ibid.*) At a hearing, the officer testified that he was about six feet from the defendant when he made the throwing motion. (*Ibid.*) When asked if he was going to detain the defendant at that time, the officer testified, " '[w]e were going to stop him and talk to him, yes.' " (*Id.* at pp. 348-349.) However, when asked if the defendant was free to go at this point, the officer responded, " '[w]e hadn't actually detained him at the time so he was free to go if he wanted to.' " (*Id.* at p. 349.)

On appeal, the Court of Appeal ultimately concluded the record reasonably supported an inference that there was no intended and actual detention when the officer called out to the defendant to "stop" under the facts. (*King, supra*, 72 Cal.App.3d at p. 349.) The court reasoned, "[t]he conduct of the police officer of the instant case--calling out to someone known to him who was walking away at an accelerating pace, 'Danny, stop, I want to talk to you'--was, in our opinion, ambiguous. From the apparent command, 'stop,' an inference of an intended and actual detention might reasonably have been drawn by the trial court. But just as reasonable, in our opinion, would be an inference of no intention to detain, but rather of an appropriate means under the circumstances of advising King of the officer's desire to talk to him. It was the latter inference that was presumably drawn by the trial court. [¶] As pointed out, where two or more inferences can reasonably be drawn from the facts, we may not substitute our deductions for those of the trial court. This latter rule is 'expressly made applicable to decisions of a trial court resolving Fourth Amendment issues.' (See *People v. Escarcega*[ (1974)] 43 Cal.App.3d 391, 394.)" (*Id.* at pp. 349-350.)

18

Here too, the use of the words "come here," and Officer Anderson's follow-up efforts to get defendant's attention, in this context, were somewhat ambiguous. The words "come here" when read or heard alone could reasonably be seen to create a detention, but an equally reasonable conclusion is that Officer Anderson's words and actions reflect that his intention was (1) to get the attention of a person with whom he had spoken at least three to four times in the past year; and (2) to communicate to that person that he wanted to talk with him, and not just the other individuals in the area. Other aspects of the interaction support this conclusion: the officers did not run their sirens and they did not use a loudspeaker; and Officer Anderson's tone was not threatening and he did not physically grab—or even touch—defendant. The trial court's conclusion about the meaning and tenor of Officer Anderson's language is supported by the record, and the trial court did not err in finding defendant's interaction with the officers began as a consensual encounter and did not rise to the level of a detention until the officers confirmed defendant's probation status.

### C. The Detention Was Justified

Even if the initial contact between the officers and defendant had not been consensual, the trial court's decision could still be upheld because the officers had a sufficient justification to stop defendant.

"The guiding principle in determining the propriety of an investigatory detention is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' ([*Terry*], *supra*, 392 U.S. at p. 19; see *In re Tony C.*[ (1978)] 21 Cal.3d [888,] 892.)" (*People v. Wells* (2006) 38 Cal.4th 1078, 1083.) "[I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one--whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." (*Terry*, *supra*, 392 U.S. at pp. 19-20.)

19

"There are two different bases for detaining an individual short of having probable cause to arrest: (1) reasonable suspicion to believe the individual is involved in criminal activity ([*Terry, supra,*] 392 U.S. [at pp.] 30-31 []) and (2) advance knowledge that the individual is on searchable probation or parole (*In re Jaime P.* (2006) 40 Cal.4th 128, 136, 139 (*Jaime P.*); *People v. Reyes* (1998) 19 Cal.4th 743, 754 (*Reyes*)). . . . In meeting a challenge to the lawfulness of a warrantless search or seizure, the People are obligated to prove by a preponderance of the evidence that the search or seizure fell within one of the recognized exceptions to the warrant requirement. (*People v. James* (1977) 19 Cal.3d 99, 106, fn. 4; *People v. Rios* (2011) 193 Cal.App.4th 584, 590.)" (*People v. Douglas* (2015) 240 Cal.App.4th 855, 860 (*Douglas*).) Here, a short detention of defendant while the officers confirmed his searchable probation would have been justified under both bases.

1.    The officers had reasonable suspicion to believe defendant was involved in criminal activity

Under the first basis for a legal detention, "[a] detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231; see also *United States v. Sokolow* (1989) 490 U.S. 1, 7 ["the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause"].) In considering if circumstances render a detention objectively reasonable, we ask if the facts are "such that *any reasonable officer in the detaining officer's position* would suspect the same criminal activity and the same involvement by the person in question." (*People v. McDonald* (2006) 137 Cal.App.4th 521, 530, italics added.)

"As [the U.S. Supreme Court] said in *Cortez*: [¶] 'The process does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same -- and so are law enforcement officers.' [*United States v. Cortez* (1981) 449 U.S. 411,] 418." (*United States v. Sokolow, supra*, 490 U.S. at p. 8.)  When an action is consistent with criminal activity, it can support reasonable cause to detain an individual, even if that action might also be consistent with an innocent activity. (See *id.* at pp. 9-10; see also *People v. Souza, supra*, 9 Cal.4th at p. 233.)  Hence, an area's reputation for criminal activity and whether an individual engages in an act of flight when approached by an officer are both permissible factors to consider in the totality of circumstances which may or may not suggest to a trained officer that the fleeing person is involved in criminal activity. (See *Souza*, at pp. 239-240; *People v. Moore* (2021) 64 Cal.App.5th 291, 301-302 ["while certainly not enough on its own, '[t]he reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely. [Citations.]' [Citation.] [¶] . . . [¶] Nervous, evasive behavior is undoubtedly a potentially significant factor to be considered in determining whether probable cause (or reasonable suspicion) exists"].)

Here, Officer Anderson pointed to a set of articulable facts, which when taken together, could objectively cause an experienced officer to conclude defendant was engaged in a criminal activity, specifically drug sales, when he decided to stop and speak with him.  The area where defendant was found was one Officer Anderson had come to consider a high crime area.  One of the crimes Officer Anderson had encountered in the area was drug sales.  Officer Anderson understood that candlelight vigils could serve as a front for drug sales, and believed someone had reported finding drugs at this particular vigil location.  Officer Anderson had seen defendant at this particular location 50 to 100 times, and usually defendant was alone and made no movement when Officer Anderson

21

approached him or went by. In contrast, on this day, Officer Anderson saw defendant standing in the doorway of a car that had pulled over with a group of other people, and when defendant saw Officer Anderson he began walking away from the scene. All of these details, taken together—regardless of defendant's PRCS or probation status—could objectively have given Officer Anderson a reasonable suspicion to believe defendant was engaged in drug sales at the time he made contact with him.

2.    The officers had advance knowledge that defendant was on searchable probation

In light of Officer Anderson's degree of advance knowledge of defendant's probation or PRCS status, the officers could reasonably have detained him for a brief period of time.

"Suspicionless searches"—i.e., searches when an officer does not have reasonable suspicion to believe the individual is involved in criminal activity—"are lawful in California for both probationers and parolees, so long as they are not conducted arbitrarily, capriciously, or for harassment. (*People v. Bravo* (1987) 43 Cal.3d 600, 610 [probationers]; [*People v.* ]*Reyes*[ (1998)] 19 Cal.4th [743, ]752 [parolees].)" (*Douglas, supra*, 240 Cal.App.4th at p. 861.) "Because a search condition is statutorily mandated for all parolees (§ 3067; [*People v.*] *Schmitz*[ (2012)] 55 Cal.4th [909,] 916; see fn. 6, *post*), the officer need only know that the individual is on parole." (*Id.* at p. 862.) In contrast, "in the case of probation searches, the officer must have some knowledge not just of the fact someone is on probation, but of the existence of a search clause broad enough to justify the search at issue," before the officer can rely on a probation search condition to justify a detention and search of an individual. (*Id.* at p. 863.)

In California, in addition to traditional probation and parole, upon release from prison, some individuals are subject to another form of supervision, postrelease community supervision or PRCS. (See § 3450 et seq.) "The Postrelease Community

22

Supervision Act of 2011, adopted as part of the 2011 realignment legislation addressing public safety (Realignment Act), provides for local post-incarceration supervision of less serious offenders released from state prison, transferring their supervision from state parole authorities. (§ 3450 et seq., added by Stats. 2011, ch. 15, § 479.) . . . A PRCS search condition, like a parole search condition, is imposed on all individuals subject to PRCS. (§ 3465.)" (*Douglas*, *supra*, 240 Cal.App.4th at pp. 863-864.) Thus, "[a]s in the case of a parole search, an officer's knowledge that the individual is on PRCS is equivalent to knowledge that he or she is subject to a search condition." (*Id.* at p. 865.) Accordingly, for a law enforcement officer to justify a detention and search because a person is on PRCS, the officer only needs to know the person is on PRCS; no separate knowledge of a search condition is required.

Though Officer Anderson's testimony suggests he may not have had a clear recollection of whether defendant was on PRCS or probation that subjected him to search during their prior encounters, we do know (a) those encounters are what led Anderson to believe defendant was on a form of supervision that required him to stop and respond to police questioning—i.e., that he was subject to a degree of searchability and detention; and (b) when the officers checked defendant's status on July 5, 2019, they confirmed he was then on informal searchable probation.

In *People v. Hill* (2004) 118 Cal.App.4th 1344, the defendant argued that a trial court had erred in denying his motion to suppress because, at the time of the search, the officer who performed the search had been erroneously informed by a dispatcher that the defendant was on parole and not probation, when, in fact, the defendant had been on probation with a search condition. The dispatcher had misread a form that showed the defendant's parole had recently expired, but he was still on probation with a search condition. (*Id.* at pp. 1347-1348.) Noting that the exclusionary rule "serves ' "to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it" ' (*Mapp v. Ohio* (1961) 367 U.S. 643, 656)" the

23

First District Court of Appeal concluded "[n]othing in this officer's conduct manifests any such disregard. [The officer's] actions do not present us with the danger of 'legitimiz[ing] unlawful police misconduct.' ([*People v.*] *Sanders* [(2003)] 31 Cal.4th [318,] 335.) To punish the responsible officer and the inept dispatcher in these circumstances creates a windfall for the defendant who was legitimately subject to a search condition. Therefore, . . . we . . . conclude the trial court did not err in denying defendant's motion to suppress." (*Hill,* at p. 1351.) Here, as the court did in *Hill*, we focus on the fact that Officer Anderson believed, based on his prior contacts that defendant was on a form of supervision that allowed for his detention and search, and not on the fact that Officer Anderson was not entirely clear in his testimony about whether that form of supervision was PRCS or searchable probation.

When he testified, Officer Anderson stated he believed he could stop defendant because defendant was on probation. During his testimony, he explained he was aware of defendant's probation status because he had been in contact with defendant three to four times in the prior year. At the prosecutor's prompting, he clarified that defendant had actually been searchable during prior contacts because he had been on PRCS during their prior contacts. In short, based on three or four contacts with defendant in the prior year, Officer Anderson believed on the date of the encounter that defendant was on some sort of community supervision that included a term that allowed Officer Anderson to detain defendant.

*Douglas* is instructive in helping us determine if this belief was objectively reasonable enough to constitute advance knowledge of defendant's searchable status. In *Douglas*, *supra*, 240 Cal.App.4th at pages 857-858, an officer traveling in a patrol car investigating recent gun violence recognized Douglas sitting behind the wheel of a parked car. The officer had arrested Douglas one to two years earlier for a firearm-related offense. The officer testified he knew the suspect was on PRCS because as part of his job he monitored who was on probation or parole. (*Ibid.*) The officer further

24

admitted that he could not recall the last time he had checked Douglas's status, but did recall having seen Douglas's name on a list of active probationers within the prior two months. (*Ibid.*) When the officer approached Douglas on foot, Douglas moved his car forward a few feet. (*Ibid.*) The officer ordered Douglas to stop and exit the car. (*Ibid.*) When Douglas exited the car, the officer pinned Douglas to the car's door and frame, which led to a quick scuffle that ended in the officer handcuffing Douglas. (*Ibid.*) A loaded gun then fell from Douglas's hand or arm area. (*Ibid.*) After the officer handcuffed Douglas, the officer asked Douglas if he was on probation and Douglas confirmed he was on probation. (*Ibid.*)

Douglas filed a motion to suppress the gun as evidence, arguing it had been the fruit of an unlawful detention. (*Douglas*, *supra*, 240 Cal.App.4th at p. 859.) The trial court denied the motion, Douglas entered a guilty plea as part of an agreement, then Douglas filed an appeal. (*Ibid.*) On appeal, Douglas challenged the constitutionality of the detention, arguing that the officer "did not have actual, current knowledge he was on searchable PRCS and also did not have reasonable suspicion he was engaged in criminal activity." (*Ibid.*, fn. omitted.)

Based on the facts available, the Court of Appeal concluded the officer had an objective belief that Douglas was on PRCS at the time he initiated the detention. (*Douglas*, *supra*, 240 Cal.App.4th at pp. 858, 871.) Under the facts in *Douglas*, the court concluded that knowledge was sufficient to justify Douglas's detention. (*Id.* at p. 873.) It reasoned, "the adequacy of the officer's knowledge must be assessed in the context in which the decision to detain and search arose. We consider in this appeal not whether [the officer] sought out all available information or undertook the best possible course of action, but whether his decision to detain Douglas was objectively reasonable in light of the knowledge he had. [The officer] had to make a rapid evaluation of the circumstances of his encounter with Douglas through the filter of his preexisting knowledge of him— which called for judgment, and was not simply a binary matter of whether [the officer]

25

subjectively knew of Douglas's PRCS status or not. In light of the immediacy of the events, the failure to run a computer check to determine the currency of Douglas's PRCS status did not render [the officers]'s actions—or his belief in Douglas's PRCS status—objectively unreasonable." (*Id.* at pp. 871-872.) The court found, "[t]he information possessed by [the officer] was reasonably reliable, ultimately proved to be accurate, and led to an objectively reasonable conclusion that Douglas was on PRCS and therefore subject to detention and search. His failure to run a current [records] check did not render his preexisting belief in Douglas's PRCS status objectively unreasonable. We therefore conclude the court properly denied the section 1538.5 motion based on [the officer]'s advance knowledge of Douglas's PRCS search condition." (*Id.* at p. 873.)

Here too, Officer Anderson's belief that defendant was on probation or PRCS and that the terms of that probation allowed officers to detain defendant was based on fairly recent prior contacts with defendant. That knowledge allowed for an objective belief that defendant remained subject to search, and that belief was sufficiently strong to justify Officer Anderson commanding defendant to stop and speak with him long enough for the officers to confirm the precise term and length of defendant's probation of PRCS.

II

*Attenuation Issue*

In his opening brief, defendant argues, assuming the officers' initial interaction with defendant was illegal, that the confirmation of defendant's searchable status did not constitute an intervening circumstance that attenuated the alleged Fourth Amendment violation from the search that produced the methamphetamine and firearms. Because we conclude that the initial interaction between the officers and defendant did not violate the Fourth Amendment, we do not consider this argument.

*Ineffective Assistance of Counsel Claims*

In supplemental briefing, defendant argues that if this court were to conclude defendant's interaction with the police officers was consensual based on the 46 seconds of body cam video entered into evidence at the motion to suppress hearing, then his counsel was ineffective for failing to introduce additional portions of the video into evidence. Specifically, defendant argues that the additional footage would show that the way Officer Anderson parked his SUV "blocked the Honda—a show of nonverbal police authority," and that "the tenor of this encounter was anything but consensual." In his reply brief, defendant again asserts additional video ought to have been admitted because, "the words [Officer] Anderson used and the way he parked were both factors that the [trial] court explicitly considered when it determined whether this was a detention or consensual encounter," and, therefore, "it was pertinent that counsel marshal these facts in appellant's favor or, at the very least, direct the court's attention to the portions of the video that directly contradicted the prosecution's case and the court's findings."

"To show ineffective assistance of counsel, defendant has the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." (*People v. Kelly* (1992) 1 Cal.4th 495, 519-520.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)

If we consider the question of whether counsel's actions caused prejudice to defendant, that "prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome.' (*Strickland v. Washington* [(1984)] 466 U.S. [668,] 694.)" (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

Given the officers would have been justified in detaining defendant while verifying his probation status, the result would be the same even if additional footage had been admitted into evidence that demonstrated the encounter was not consensual.

Moreover, we disagree with defendant's characterization of the impact the additional evidence would have had on the court's determination regarding the consensual nature of the encounter —the admission of additional footage would not change the finding that the encounter leading up to the verification of defendant's searchable status was consensual. For example, the still shot of the SUV parked before the Honda used in the opening brief, which came from after the 46 seconds admitted during the motion to suppress, shows the Honda and SUV were parked on a street that did not have heavy traffic, that the SUV was not particularly close to the Honda, and that the Honda could have easily and safely maneuvered around the SUV into traffic. Similarly, the dialogue that follows the first 46 seconds and ends when Officer Anderson verified defendant's searchable status shows Officer Anderson indicating he just wants "to talk" with defendant, Officer Anderson calmly asking defendant if he is on probation and defendant insisting he is not on any probation or parole, Officer Anderson asking defendant what he and his companions are doing in a calm tone, Officer Anderson telling defendant he sees him at the site every day, and Officer Anderson telling Officer Jensen defendant had said he was not on probation or parole. During that timeframe, Officer Anderson does not move closer to defendant, raise his voice, or otherwise exert his authority in a way that would have conveyed to defendant that he was not free to end the conversation. The court would have been just as likely, if not more likely, to find the initial encounter consensual if it had considered the extra footage.

28

## DISPOSITION

We affirm the trial court's ruling on the motion to suppress and the judgment that followed.

_____
HULL, Acting P. J.

We concur:

_____
MAURO, J.

_____
DUARTE, J.